## Case No. 12,840.

### SICKLES v. GLOUCESTER CO.

[3 Wall. Jr. 186;[1] 13 Leg. Int. 292.]

Circuit Court, E. D. Pennsylvania. April Term, 1856.

TRIAL—EXAMINATION OF WITNESSES — IN EQUITY —ACTS OF CONGRESS.

Under the practice of the courts of the United States, as fixed by the judiciary act of 1789 [1 Stat. 73], a party may examine or cross-examine witnesses ore tenus in equity suits as well as in suits at common law; the power given him in this respect by the 30th section of that act, not being taken away from him by any subsequent act, nor by the 67th rule of practice for the courts of equity promulgated on the 2d of March, 1842, nor in any other manner.

[Cited in Bronson v. La Crosse & M. R. Co., Case No. 1,930; Cochrane v. Deener, 94 U. S. 783; Atwood v. Portland Co., 10 Fed. 283, 285; Wise v. Grand Ave. Ry. Co., 33 Fed. 278.]

This was a question as to the mode of taking evidence in equity suits in the federal courts; and arose upon a bill in equity for the infringement of a patent. The case was thus: The thirtieth section of the act of September 24, 1789, which organized the courts of the United States, and is commonly called the judiciary act, enacts "that the mode of proof by oral testimony and examination of witnesses in open court, shall be the same in all the courts of the United States, as well in the trial of causes in equity, and of admiralty and maritime jurisdiction, as of actions at common law." A section in an act of 1802 (Act April 29, 1802, § 25, [2 Stat. 166]) says "that in all suits in equity, it shall be in the discretion of the court to order the testimony of witnesses to be taken by deposition," with certain provisos. Notwithstanding this first act, it had never been the practice in equity cases in this circuit, nor in any other circuit, so far as was known to the court, or counsel, to take testimony ore tenus, nor, except when proceeding under the act of 1802, otherwise than according to the rules and practice of the court of chancery in England; where, as is known, the testimony is taken by the commissioner on interrogatories and cross-interrogatories previously filed, and without the presence of the parties or their counsel; and where the testimony, when taken, is sealed up, until an order is obtained for publication of it, after which no more testimony can be taken.

On 2d of March, 1842, the supreme court of the United States promulgated a body of "Rules of Practice for the Courts of Equity," the sixty-seventh of which rules runs thus: "Commissions to take testimony may be taken jointly * * * by both parties or severally by either party upon interrogatories filed by the party taking the same * * * ten days' notice thereof being given to the adverse party to file cross-interrogatories before the issuing of the commission.

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

* * * If the parties shall so agree, the testimony may be taken upon oral interrogatories," &c. The sixty-eighth rule is thus: "Testimony may also be taken in the cause * * * by deposition, according to the acts of Congress." 1 How. [42 U. S.] lxii. An act of congress passed soon after, to wit, on the 23d of August, 1842 [5 Stat. 518, § 6] gives to the supreme court "full power and authority * * * to prescribe and regulate and alter * * * the forms and modes of taking and obtaining evidence * * * in suits at common law, or in admiralty and in equity pending in the district and circuit courts * * * and generally to regulate the whole practice of the court."

With these statutes, rules and practice in existence, a rule for a commission had been taken by the defendant; and Mr. E. N. Dickerson, counsel of the other side, having filed the complainant's affidavit that the evidence in the case, if taken before a commissioner upon interrogatories, and cross-interrogatories, would operate unjustly and prejudicially to his interests, obtained a special order that he might have power to cross-examine the witnesses ore tenus, and "that the testimony so taken shall have the same effect as if taken under the sixty-seventh rule" above mentioned.

Mr. Jenks, for the defendant, having protested before the commissioner against such a mode of taking testimony, and having declined to cross-examine, now moved that the depositions should be suppressed, and that an examination of all the witnesses should be had privately before the master.

In favor of the motion: The court had no power to make the order on which this testimony has been taken. The only ground on which it can be pretended that testimony taken, as this has been, can be read, is the thirtieth section of the judiciary act of 1789. But, (1) that section has been interpreted in our favor by a constant practice of sixty-seven years. The supreme court has, moreover, interpreted it by its own rules. The sixty-seventh rule shows that the English practice, in its outlines at least—which practice prevails over our country generally, where there are courts of equity, and has always prevailed in this court,—was meant to be continued. However plain the language of the judiciary act may seem to us, we are bound to receive an interpretation so long and so clearly put upon it by the practice and rules of the supreme court; an interpretation hardly inferior in solemnity to a judgment of the court. Indeed, an uninterrupted practice of sixty-seven years can hardly be said to be, in any respect, of less value than a judgment. It is the best of all judgments. "The great authority with me," says C. J. Bridgman, "is constant practice if I am well informed." It is "law solidified into fact." (2) The thirtieth section of the judiciary act has been in effect repealed. The act of 23d August, 1842, gives to the supreme court pow-

er to "alter" the "forms and modes of taking and obtaining evidence." The sixty-seventh rule, which we rely on, was indeed made in March, 1842, and before the act of 23d of August was passed; but it has been acknowledged, ratified, re-adopted and republished, by being retained and constantly acted upon up to this hour. (3) The truth is, that the section in question of the old judiciary act, meant to establish a mode of taking testimony which it thought would be regarded by the profession as more convenient than the old one. But the old one was familiar to the bar, they liked it best, and never abandoned it. This provision, therefore, of the judiciary act, without being formally repealed, became obsolete, effete and forgotten.

GRIER, Circuit Justice. The jus pretorium of the Roman law, from which our system of equity has its origin, was introduced when chancellors were priests. The writ of subpœna is said to have been first devised by Chancellor Waltham, bishop of Salisbury. It met with opposition at the beginning by parliament, "because its proceedings were according to the civil law and the law of holy church, in subversion of the common law." But notwithstanding the opposition then, and also of Sir Edward Coke and the common law courts at a later day, the chancellors persevered in extending their jurisdiction, and when the office ceased to be in the hands of ecclesiastics, a system of jurisprudence and jurisdiction was built up on a rational foundation by the learning and ability of Nottingham and his successors. Yet it still retains some of the features which originally caused the enmity of the common lawyers and the parliament. One of these is the mode of taking testimony. At common law it was considered as essential to justice and the protection of the rights of the litigant that the witnesses should be examined in presence of the parties to be affected, and of the tribunal whose decision was to be governed by the testimony. The mode of taking testimony in chancery, as introduced from "the civil law and law of holy church," is by secret inquisition. The reason given for this practice is said to be "in order to avoid the risk of defects being discovered in the course of taking it, and false evidence being procured to remedy them." Adam, Eq. 64. As a reason for a foregone conclusion, this was no doubt considered satisfactory, though it might as well read "to avoid the risk of defects and falsehood being discovered, and true evidence being procured to remedy them."

And yet, while it is true that as a general rule of courts of chancery, all witnesses will be examined on interrogatories, either by the regular examiner of the court or through the medium of commissioners specially appointed, it has never been decided that a chancellor had no power to order otherwise in a particular case, where he might consider it necessary to a proper investigation of the facts. No court is so enslaved by its general rules as to be powerless, when justice requires an exception to their operation. Accordingly, numerous cases of exceptions may be found in the books of Practice. Daniell, Eq. Prac. 1048. The practice also of sending issues of fact to a court of law to be tried by a jury and according to the principles of the common law, may be truly said to be an exception to this ecclesiastical rule of trying facts by secret inquisition, and an admission of its incompetency for a proper investigation of the truth.

But assuming a court of equity to be so bound up by their general rules, that they have no power to deviate from them in a special case for sufficient cause shown; is there any statute or iron rule of practice which compels the courts of equity of the United States to adhere to this policy of the civil and ecclesiastical law as a fundamental principle in the administration of justice?

The act of 1789, constituting the courts of the United States, declares "that the mode of proof by oral testimony and examination of witnesses, shall be the same in all the courts of the United States, as well in the trial of causes in equity and of admiralty and maritime jurisdiction, as of actions at common law."

Whatever, therefore, may be the force and binding effect of this fundamental principle as to the peculiar "mode of proof," in the English courts of chancery, it is clearly repudiated and abolished as a rule of practice in the courts of equity of the United States.

It is not a fair construction of the sixty-seventh rule of court, which imputes to it an intention of repealing or overruling an act of congress admitted to be within the scope of its constitutional power.

It being found inconvenient and dilatory in practice, and seldom necessary to a proper investigation of causes, to have witnesses examined ore tenus in open court, in chancery cases, the sixty-seventh rule merely provides, that "after the cause is at issue, commissions to take testimony may be taken out in vacation as well as in term."

When witnesses live at a distance, the parties are compelled to resort to this rule in order to obtain their testimony; and in most cases, when the witnesses might be brought into court, this practice is pursued as most convenient. Judges have been rather disposed to discountenance the production of witnesses in court, on account of the delay consequent on an ore tenus examination. Besides, counsel, who are more apt to look to books of chancery practice than to their own statute books, have either not been aware of the rights of their clients, or not thought it a matter of sufficient importance to urge them. Hence it is, that the old practice has been generally pursued, and perhaps enforced, without much inquiry.

The act of 1789 is a fundamental statute; and we have, therefore, as a fundamental principle in the administration of equity in the courts of the United States, that the mode

of proof by oral testimony, and examination of witnesses in courts of equity, shall "be the same as in actions at law." Either party has a right, therefore, to cross-examine witnesses ore tenus, and when not examined in open court, to have notice of the time and place of taking the testimony, so that he may see the witness face to face, and thus examine or cross-examine him. In many cases, as has been shown by experience, it is absolutely necessary that the party be allowed this privilege, in order to elicit the whole truth, and save himself from a garbled statement of it, which may be as injurious as direct perjury. This may be said to be the general rule, and any deviation from it is the exception. The party who claims his right is not asking a favor of the court, or making a demand which the chancellor, in his discretion, may deny; but is demanding a right guaranteed to him by the law of the land; not one held at the discretion of a judge, nor to be abolished by custom or rule of court. The secret examination of witnesses within reach of the process of the court is contrary to the policy of the law; either party may object to it at his discretion, and the court are bound to allow it. A court may dispense with their own rules in a special case, but cannot deny to a party a right guaranteed to him by statute, or the law of the land.

The circuit courts of the United States have original jurisdiction in patent cases, and do not exercise their authority merely as auxiliary to a court of law, and for a more effectual remedy. Hence we do not feel bound in all cases to send a party to establish his right in a court of law, before granting a final injunction. In many questions of originality and infringement of patents, the concurrent opinion of twelve men, with little knowledge of the principles of science and philosophy which affect the case, may give but little satisfaction to the conscience of a chancellor: Hence it is becoming more common to examine these questions in courts of equity, without the aid of a jury, unless where the issue depends rather on the credibility of witnesses, than the value of their opinions as experts or philosophers. But such cases cannot be properly brought before the court by secret examination of the witnesses. It is almost impossible to frame interrogatories in chief so as completely to elicit the truth, where the witness has to refer to complex models or drafts. The whole truth can seldom be obtained, or falsehood detected, unless by a sharp cross-examination ore tenus, by skilful counsel. It is sometimes the case also, and in fact, too often, that the party, or his counsel, prepare the answers for their witnesses after consultation, so that the witness comes before the examiner and reads off his answers to the several interrogatories, as prepared for him by the party who produces him. That such things are sometimes done, we know; but how often, we cannot know. And however ready a court may be to sup-

press testimony thus made up, the fact must be known to the opposite party before he can make proof of it; and this secret mode of taking testimony, gives no opportunity for its discovery.

As a question of mere policy and the proper administration of justice, we believe that the truth of a case can be better eviscerated, by an ore tenus examination of the witnesses by counsel, than by the secret method of inquisition borrowed from "holy church."

We are of opinion, therefore—

1. That this portion of the peculiar policy of courts of equity has in the courts of the United States been rejected by statute, and that it never has been a fundamental principle in their administration of equity.

2. That the sixty-seventh rule of the series of rules promulgated by the supreme court, in 1842, does not affect to annul the act of congress, or the policy established by it.

3. That a party has therefore a right to demand an examination of witnesses within the jurisdiction of the court, ore tenus, according to the principles of the common law, either by having them produced in court, or by having leave to cross-examine them face to face before the examiner.

4. That the court had not only power to make the rule or order complained of in this case, but was bound to allow it, not only as requisite to a proper development of the facts necessary to its just decision, but also as a right of the party guaranteed by law.

Motion denied.